[Cite as *State v. Smith*, 2020-Ohio-5316.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
LAWRENCE COUNTY

State of Ohio,                    :          Case No. 19CA23

   Plaintiff-Appellee,          :

   v.                           :          <u>DECISION AND</u>
                               <u>JUDGMENT ENTRY</u>

Spanish M. Smith,                 :

   Defendant-Appellant.        :          **RELEASED 10/26/2020**

---

<u>APPEARANCES</u>:

Angela Miller, Jupiter, Florida, for appellant.

Brigham M. Anderson, Lawrence County Prosecutor, and W. Mack Anderson, Lawrence County Assistant Prosecutor, Ironton, Ohio, for appellee.

---

Hess, J.

{¶1}   Spanish M. Smith appeals his multiple drug trafficking convictions, two firearm specifications, and having a weapon under disability and contends that: (1) the trial court erred by denying his motion to suppress his statements made to investigating detectives; (2) there was insufficient evidence to support the two firearm specifications and his conviction for having a weapon under disability; (3) the trial court erred in sentencing him to 54.5 years in prison; and (4) his convictions for drug trafficking as set forth in count six of the indictment, the gun specifications, and having a weapon under disability were against the manifest weight of the evidence.

{¶2}   Smith argues that his waiver of his *Miranda* rights was coerced because after he expressly waived his *Miranda* rights, investigating officers told him that they were not gathering evidence or recording the interview when, in fact, they were. We conclude

that the trial court did not err in denying Smith's motion to suppress because the investigators did not use coercive police tactics during the interview. Smith's waiver of his *Miranda* rights was voluntary. We overrule Smith's first assignment of error.

{¶3}    In his second and fourth assignments of error, which for ease we address together, Smith contends that his firearm specifications and having a weapon under disability conviction were not supported by sufficient evidence and that these convictions as well as his conviction on count six, fourth-degree trafficking in heroin, were against the manifest weight of the evidence. He argues that there was no evidence that the firearms were in "close proximity" to the drugs. However, law enforcement who monitored the controlled drug buys and executed the search warrant of the premises testified that the firearms were "within mere feet" of Smith when he was recorded selling heroin and methamphetamine to the confidential informant. We find that the firearm specification and having weapons under a disability conviction were supported by the manifest weight of the evidence. Upon review of the entire record, the trier of fact did not lose its way or create such a manifest miscarriage of justice that reversal of the conviction is necessary.

{¶4}    Smith argues that his conviction on count six for trafficking in heroin was against the manifest weight of the evidence because the recording device malfunctioned and there was no audio/video recording of the first controlled buy. Smith contends that the only testimony of this transaction was the testimony of the confidential informant, who had credibility issues.  However, the credibility of the confidential informant's testimony was bolstered by its consistency with the other four controlled buys, which were supported with audio/video recordings of Smith making these sales. Additionally, law enforcement's testimony concerning the first controlled buy was consistent with the confidential

informant's testimony. We find that Smith's conviction on count six, trafficking in heroin, was supported by the manifest weight of the evidence. Upon review of the entire record, the trier of fact did not lose its way or create such a manifest miscarriage of justice that reversal of the conviction is necessary. Because Smith's firearm specifications, weapon conviction, and trafficking in heroin conviction under count six were supported by the manifest weight of the evidence, they were necessarily supported by sufficient evidence. We overrule Smith's second and fourth assignments of error.

{¶5}    Last, Smith contends that the trial court erred in sentencing him to 54.5 years in prison.[1] He argues that the record does not support the individual maximum sentences the court imposed for every offense. He does not contest the trial court's decision to run the sentences consecutively. We find that the imposed sentences are not clearly and convincingly unsupported by the record where it is established that Smith was a major drug offender with large quantities of money, heroin and methamphetamine and a violent criminal history.  We overrule Smith's third assignment of error and affirm the judgment of the trial court.

## I. PROCEDURAL HISTORY

{¶6}    In March 2019, the Lawrence County Grand Jury indicted Smith on seventeen counts, including multiple drug trafficking counts, two firearm specifications, a

---

[1] The sentencing entry does not include a calculation of the total term of years in prison. Smith's brief states that the total prison term is 54.5 years. However, by our calculation, Smith was sentenced to a total term of 56 years in prison (1 year (specification) + 18 months (Ct. 6) + 8 years (Cts. 7/8) + 8 years (Cts. 9/10) + 8 years (Cts. 11/12) + 8 years (Cts. 13/14) + 11 years (Ct. 15) + 8 years (Ct. 16) + 30 months (Ct. 17) = 56 years). Smith may have erroneously calculated Count 6 and the gun specification as running concurrently, but because R.C. 2929.14(C)(1)(a) requires that the terms imposed for the gun specifications be served "consecutively to any other prison term * * * previously * * * imposed upon the offender," the trial court was not required to specify in the sentencing entry that the gun specification term was to be serve consecutively to his sentence. *State ex rel. Shafer v. Wainwright,* 156 Ohio St.3d 559, 2019-Ohio-1828, 130 N.E.3d 268, ¶11.

forfeiture specification involving a cash sum of $33,385.00, and having a weapon while under disability. The indictment arose out of a number of controlled buys by which the Lawrence County Drug and Major Crime Task Force used a confidential informant and marked money to make purchases of heroin and methamphetamine from Smith on five different occasions, four of which were recorded.

{¶7}   The state nolled the first five counts and the case proceeded to trial on the following: counts six, eight, ten, twelve, fourteen – trafficking in heroin, fourth-degree felonies in violation of R.C. 2925.03(A)(1)(C)(6)(c); count seven, nine, eleven, thirteen – aggravated trafficking in drugs, second-degree felonies in violation of R.C. 2925.03(A)(1)(C)(1)(d); count fifteen – trafficking in heroin, a first-degree felony in violation of R.C. 2925.03(A)(2)(C)(6)(g); two firearm specifications and a forfeiture specification to count fifteen; count sixteen – aggravated trafficking in drugs, a second-degree felony in violation of R.C. 2925.03(A)(2)(C)(1)(d); and count seventeen – having a weapon while under disability, a third-degree felony in violation of R.C. 2923.13(A)(2). Prior to trial Smith filed a motion to suppress statements he made to investigators during an interview on the ground that the waiver of his *Miranda* rights was coerced. The trial court denied the motion. A jury found Smith guilty of all counts and the trial court sentenced Smith to a 56-year prison term.

## II. ASSIGNMENTS OF ERROR

{¶8}   Smith assigns the following errors for our review:

1. The trial court erred in denying Appellant Smith's Motion to Suppress Evidence. Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 14 of the Ohio Constitution.

2. The verdict was supported by insufficient evidence as to the specifications that Appellant Smith had a firearm on or about his person

or under his control while committing the offense of trafficking in heroin. Additionally, there was insufficient evidence to find Appellant Smith guilty of having a weapon under disability. U.S. Const. Amends. V, VI, and XIV; Article I, §§5, 9, 16 of the Ohio Constitution.

3. The trial court erred in sentencing Appellant Smith to 54.5 years in prison. U.S. Const. Amends. V, VI, VIII, and XIV; Ohio Const. Art. I §§2, 9, 16 and 20; R.C. 2929.11 and R.C. 2929.12.

4. Appellant Smith's convictions for drug trafficking, having a weapon under disability, and gun specifications were against the manifest weight of the evidence.

### III. LAW AND ANALYSIS

#### A. Motion to Suppress

##### 1. Standard of Review

**{¶9}** In general "appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Codeluppi*, 139 Ohio St.3d 165, 2014-Ohio-1574, 10 N.E.3d 691, ¶ 7. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.* " 'Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.' " *Codeluppi* at ¶ 7, quoting *Burnside* at ¶ 8.

##### 2. Validity of Waiver of *Miranda* Rights

**{¶10}** Smith challenged the use of his statements obtained after law enforcement executed a search warrant, arrested him, and brought him into the Lawrence County Prosecutor's Office for an interview. He concedes that he was properly informed of his

*Miranda* rights at the beginning of the interview and voluntarily, expressly waived those rights. However, he argues that during the course of the questioning, he was told, "This conversation we're having is not an evidence gathering thing, you know what I mean? We got what we got." Smith also argues that during the course of the questioning he asked if the interrogation was being recorded and he was falsely told that it was not. In his motion to suppress, Smith contended, "By telling the Defendant the statement was not being recorded and was not being used for evidence gathering, the State of Ohio used coercive tactics which invalidated the waiver previously signed by the Defendant because the Defendant was not aware the statements would be used to secure a conviction." He argued that, like the situation where the accused invokes his right to counsel and questioning must cease until a new waiver is procured, these statements also required law enforcement to obtain a new waiver.

{¶11} The Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution provide that no person shall be compelled to be a witness against himself or herself in any criminal case. *State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, 62 N.E.3d 153, ¶ 30. "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "A suspect in police custody 'must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' " *State v. Lather*,

110 Ohio St.3d 270, 2006-Ohio-4477, 853 N.E.2d 279, ¶ 6, quoting *Miranda* at 479, 86 S.Ct. 1602.

**{¶12}** Police are not required to administer *Miranda* warnings to every person they question, even if the person being questioned is a suspect. *State v. Biros*, 78 Ohio St.3d 426, 440, 678 N.E.2d 891 (1997), citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). *Miranda* warnings are required only for custodial interrogations. *Id. Miranda* defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* at 444, 86 S.Ct. 1602; *Matter of R.C.*, 2020-Ohio-1486, __ N.E.3d__, ¶ 6-7 (4th Dist.).

**{¶13}** "The *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions. Any waiver, express or implied, may be contradicted by an invocation at any time. If the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease." *Berghuis v. Thompkins*, 560 U.S. 370, 387–88, 130 S.Ct. 2250, 2263–64, 176 L.Ed.2d 1098 (2010). An accused who wants to invoke his or her right to counsel or the right to remain silent must do so unambiguously. *Id.* at 381 ("there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel" – both must be invoked unambiguously); *State v. Lawson*, 4th Dist. Pickaway No. 14CA20, 2015-Ohio-4394 (discussing *Berghuis, supra*).

**{¶14}** "To determine whether a suspect knowingly, intelligently, and voluntarily waived his *Miranda* rights, courts examine the totality of the circumstances." *State v. Barker,* 149 Ohio St.3d 1, 2016-Ohio-2708, 73 N.E.3d 365, ¶ 24, citing *State v. Clark,* 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988).

> "While voluntary waiver and voluntary confession are separate issues, the same test is used to determine both, i.e., whether the action was voluntary under the totality of the circumstances." *State v. Clark* (1988), 38 Ohio St.3d 252, 261, 527 N.E.2d 844, 854. "In *Colorado v. Connelly* (1986), 479 U.S. 157 [107 S.Ct. 515, 93 L.Ed.2d 473], the court held that 'police overreaching' is a prerequisite to a finding of involuntariness. Evidence of use by the interrogators of an inherently coercive tactic (e.g., physical abuse, threats, deprivation of food, medical treatment, or sleep) will trigger the totality of the circumstances analysis." *Id.* Accordingly, we need not assess the totality of the circumstances unless we find that the tactics used by the detectives were coercive. *Id.* (Brackets sic.)

*State v. Treesh,* 90 Ohio St.3d 460, 472, 2001-Ohio-4, 739 N.E.2d 749.

**{¶15}** The totality of the circumstances includes "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 25, quoting *State v. Eley*, 77 Ohio St.3d 174, 178, 672 N.E.2d 640 (1996). By this definition of "totality," a court is to look to all of the evidence to determine a suspect's understanding, which can be implied by his conduct and the situation. *See State v. Walker*, 2017-Ohio-9255, 103 N.E.3d 325, ¶ 19 (1st Dist.).

**{¶16}** Here, Smith was subject to a custodial interrogation and was administered proper verbal and written *Miranda* warnings, which he expressly waived both verbally and in writing. Investigators Marcum and Adkins told Smith that in the course of their investigation, they made controlled purchases of illegal drugs with an undercover

informant and "we got little home movies of . . . where we've got you talking, describing about how you work. Do you know what I mean? We got recorded phone calls." After explaining that they had controlled buys and audio and video recordings of Smith selling "crystal meth" and "other drugs," Investigator Adkins explained:

> Adkins: This conversation we're having is not an evidence gathering thing, you know what I mean? We got what we got. * * * We're here for what we're here for, you know what I'm saying?
>
> Smith: I understand. I already knew all that, though, anyway.
>
> Marcum: And, you know, when we . . . when we come to this point in an investigation, we don't come here (unintelligible), you know what I mean?
>
> Smith: Mmmhmm.
>
> Marcum: We already got our ducks in a row in a row [sic], so to speak.
>
> Smith: Mmmhmm.
>
> Marcum: Uh, I work for the Prosecutor. I'm the Chief Investigator here and I run our drug task force.
>
> Smith: Mmmhmm.
>
> Marcum: Perry works here, too, with the task force. One of the things our prosecutor requires us to do is to sit down and talk with everybody that we arrest and just kinda lay it out for them, that this is what it is.
>
> Smith: Mmmhmm.
>
> Marcum: Un, we wouldn't be up there and put handcuffs on ya if we didn't have enough to accomplish our objective. * * *

**{¶17}** Further in the questioning, Investigator Adkins explains:

Adkins: * * * "That's why we're here talking. To find out a little about you and what's going on. What do you think?"

Smith: um…

* * *

Marcum: * * * What's brought you here?

Smith: What you mean? What brought me to this . . . to this seat?

Adkins:  Mmmhmm.

Smith: Ummm, getting arrested (laughing).

Adkins: We know that, man (laughing).

Marcum: That's obvious, man (laughing). You're sitting here in handcuffs. We've explained to you what we've got, all right?

Adkins: There's a reason . . .

Smith: Oh, I know, I know, I know.

Adkins: . . . there's a reason why men get into this stuff. Do you know what I mean?

Smith: Right, right, right.

Adkins: Some guy's got different reasons for doing it. We're asking you what are your reasons?

Smith: I don't know. I don't know. Typical reasons. Besides . . . I don't know.

Marcum: You paying the . . .you paying the bills there?

Smith: Where?

Marcum: Where we got you at.

Smith: I don't want to say.

Marcum: Okay. Well, wherever you're at, you know what I mean? If you don't have an income, you gotta make a living somehow. Is that fair?

Smith: Mmmhmm.

Marcum: Huh?

Smith: Mmmhmm.

Marcum: When did you first start . . . start into this stuff? How old were you?

Smith: Can I ask a question, is this . . . is this conversation being recorded?

Marcum: No.

Smith: So if it . . . 'cause if it's recorded then, I'm not . . . I'm not . . . I'm not saying anything.

Marcum: It's not being recorded, it's just talking.

Smith: So this . . . I signed a Miranda warrant?

Marcum: You signed a waiver of your Miranda rights. Anything you say to us can be used against you . . .

Smith: Right. So . . .

Marcum: . . . in a court of law, okay?

Smith: . . . that's still . . . uh, uh, that's still like it's being recorded in some way.

Marcum: Well. . .

Smith: I don't want to answer any questions that got to do with anything about somebody trying . . . about trying to . . . uh, by the (unintelligible) court. I'm not about to answer no questions. I might answer other questions, but I'm not about to incriminate myself.

Marcum: Okay.

Smith: . . .about me . . . about any drugs . . . drug related.

Marcum: Any drug activity?

Smith: Mmmhmm. I wasn't about to answer . . . I mean, I'm not about to sit here and say I've been selling dope since I was such and such . . .

Marcum: Spanish, look at me. At the end of the day, rest assured of one thing, all we're after is the truth.

Adkins: That's it. One hundred percent.

Marcum: One hundred percent. And let the chips fall where they may.

Smith: Yeah.

Marcum: That's our job.

Smith: I'm saying I'm still going to jail.

{¶18} Smith argues that the investigators' statements that the conversation was "not an evidence gathering thing" and was not being recorded were coercive statements that required them to obtain a new *Miranda* waiver. While we find that these two statements were false, they were not coercive.

{¶19} "Evidence of use by the interrogators of an inherently coercive tactic (e.g. physical abuse, threats, deprivation of food, medical treatment or sleep) will trigger the totality of the circumstances analysis." *State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988). "To support a determination that a confession was coerced, the evidence must establish that: (1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear defendant's will; and (3) defendant's will was, in fact, overborne as a result of the coercive police activity." *State v. Humphrey,* 4th Dist. Ross No. 10CA3150, 2010-Ohio-5950, at ¶ 18, *vacated on other grounds*, 128 Ohio St.3d 397, 2011-Ohio-1426, 944 N.E.2d 1172, quoting *United States v. Rigsby*, 943 F.2d 631, 635 (6th Cir.1991); *State v. McClellan,* 4th Dist. Highland No. 18CA11, 2019-Ohio-4339, ¶ 18, *appeal not allowed*, 157 Ohio St.3d 1540, 2020-Ohio-122, 137 N.E.3d 1218, ¶ 18.

> The tactic of lying to a suspect about the evidence is not in itself sufficient to render a confession involuntary. *See Frazier v. Cupp*, 394 U.S. 731, 737-739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (false statement that a codefendant had confessed did not make statement involuntary); *Ledbetter v. Edwards*, 35 F.3d 1062, 1066, 1070 (6th Cir.1994) (false statements that defendant's fingerprints had been found at crime scene and that the victim and two witnesses had identified him did not render confession involuntary); *Bays*, 87 Ohio St.3d at 22-23, 716 N.E.2d 1126 (misleading defendant about the strength of the evidence against him did not make confession involuntary). However, the fact that the detectives misrepresented the evidence is a relevant factor in evaluating whether the totality of the circumstances renders the confession involuntary. *Frazier* at 739, 89 S.Ct. 1420.

*State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 196 (though detectives misled Ford by telling him that his DNA was found on shoes and gloves, it was insufficient to render his confession involuntary).

**{¶20}** After carefully reviewing the record, we find, based on the totality of the circumstances, that Smith's *Miranda* waiver was voluntary and the subsequent statements by investigators that the conversation was not "evidence gathering" or recorded did not require the investigators to obtain a new *Miranda* waiver. First, Smith was properly advised of his *Miranda* rights and expressly waived them verbally and in writing at the start of the interrogation. During the interrogation, Smith did not unambiguously invoke his right to counsel or his right to remain silent. *See Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981) ("an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police").

**{¶21}** Smith was a 28-year old man with a tenth-grade education who could read and write. Smith had prior involvement with law enforcement and had been convicted of voluntary manslaughter and sentenced to a fifteen-year prison term in West Virginia. Before the interrogation began, the investigators provided Smith a cup of coffee at his request. The investigators tone throughout the interview was conversational and polite. The interrogation was held in an office where Smith was seated comfortably, and it lasted approximately 90 minutes. Though Smith became emotional at times and was provided tissues and was verbally consoled by Investigator Adkins, Smith did not sound confused,

tired or under duress and responded to questions in a conversational style. There is no evidence of physical deprivation, mistreatment, threats, improper inducement, or other coercive police tactics.

{¶22} Investigator Adkins's statement that the conversation was "not evidence gathering" was made in the context of explaining to Smith that investigators already had a number of recorded, controlled illegal drug buys from Smith. In that context, Smith could reasonably infer that they already had sufficient recorded evidence of Smith's drug trafficking activities that they did not need additional evidence from him. Smith had previously been advised that anything he says can be used against him in the court of law. This warning was repeated to Smith when he asked whether the interrogation was being recorded. His response was "that's still like it's being recorded in some way." Later in the interrogation, Smith stated that he knew that his statements could be used as evidence.

{¶23} Smith did not assert his right to remain silent. Instead, he told investigators he would not answer questions about whether he was paying the bills at the apartment where he was arrested and he would not make incriminating statements, "I'm not about to incriminate myself . . . about me . . . about any drugs . . . drug related." Immediately after telling investigators that he was not going to make incriminating statements about drug related activities, he conceded, "I'm saying I'm still going to jail."

{¶24} Investigator Marcum responded by explaining that the point of the interrogation was to "get at the truth" and give Smith the opportunity to say "why I'm involved in this." Investigator Marcum and Adkins both assured Smith that there was no question that Smith was trafficking in drugs: "We know you've been trafficking in drugs

from apartment 5C. We can prove that all day long. It's not a question of that, man. It's just a question of why." Investigator Adkins showed Smith a screen shot of Smith from a video of one of the controlled buys and explained that they found bags of heroin. Smith then voluntarily answered questions about his drug activities and asked what he could get out of cooperation, "So, what y'all want me to do? Like, is there some way y'all can help me get out of this? * * * I just want to know what was the purpose of . . . of this. I can understand the general purpose was to get information to whoever I'm dealing with, so, what . . . what's in it for me? What do I get out of it?"

{¶25} After investigators told Smith that they cannot promise him anything, Smith asked questions about the nature of his arrest warrant, the felony level of the drug trafficking charge, whether he would be prosecuted in state or federal court, and whether he would be able to be out of jail on bond. The investigators told Smith that they have multiple recorded controlled buys from Smith over a three-month period. Smith then voluntarily answered questions and told investigators that he knew his statements would be used as evidence: "I already know this is evidence, so, if I say somebody else's name it's gonna be evidence against somebody else." Smith also stated that he understood "this process" and asked whether the investigators found money and acknowledged that if they had found money then, "there's no way I can get out of here anyways, so it's pointless. I just have to fight it the old[-]fashioned way. I've been in worse positions than this, I'm guessing. But, it's not like I'm a bad guy." Smith also conceded that he was "on parole. So, it's like, there's no possible way for me to walk outta this."

{¶26} Smith explained that he was concerned about the other individuals that were arrested and taken into custody with him after the execution of the search warrant.

He expressed the need to ensure that these individuals "get out in some kind of way." Smith explained that everything he was going to do was "to get them out, because I care about them people." Smith then told investigators that everything in both apartments was his and none of the others were involved.

> Smith: I gave everybody opportunities. Fuck. Somebody gave me opportunities. This shit is illegal. All right. Fuck it. I don't care. I got good intentions. * * * Everything's mine.
>
> Marcum: Excuse me?
>
> Smith: Everything's mine! The fucking dope, the money is mine. Don't nobody know about nothing. Don't nobody had nothing to do about nothing. Okay. The shit is mine. Fuck! I don't care. Everything's mine. It's all mine.

As investigators questioned Smith about the quantity and location of the money and drugs, Smith accurately identified where the drugs and money were hidden in apartment 5C and 10C, and he continued to take sole responsibility for all of the drug trafficking activities.

> Smith: I'm not . . . I'm not giving you any details. I'm telling the truth. You want the truth. That's why you needed the truth. It's mine. Everything is fucking mine. I take responsibility for everything. It don't matter . . . I mean it shouldn't matter, the specifics. I mean, you gotta clear conviction. * * * I just told on myself. Okay. * * *.

**{¶27}** We have reviewed the transcript of the suppression hearing and the recording of Smith's interview with Investigators Adkins and Marcum and find that the trial court properly denied Smith's motion to suppress. No coercive police activity occurred. Although the investigators falsely told Smith that they were not gathering evidence or recording Smith's statements when they actually were, these statements were insufficient to overbear Smith's will. In fact, Smith stated that he knew his statements were evidence and, because his statements could be used against him in a court of law, "that's still like

it's being recorded in some way."  Smith's waiver of his *Miranda* rights was voluntary and he did not unambiguously invoke his right to counsel or to remain silent.

**{¶28}**  We overrule Smith's first assignment of error.

### B. The Firearms & The February 5, 2019 Controlled Buy

**{¶29}**  In his second assignment of error and the second part of his fourth assignment of error, Smith contends that there was insufficient evidence to support the gun specifications and having weapons while under a disability conviction and these convictions were against the manifest weight of the evidence. In the first part of his fourth assignment of error, Smith contends that his conviction on count six of the indictment (the February 5, 2019 controlled buy) was against the manifest weight of the evidence. For ease of discussion we will address these assignments of error together.

### 1. Standard of Review

**{¶30}**  "When a court reviews the record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 146, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A sufficiency assignment of error challenges the legal adequacy of the state's prima facie case, not its rational persuasiveness. *State v. Koon*, 4th Dist. Hocking No. 15CA17, 2016-Ohio-416, ¶ 17. "That limited review does not intrude on the jury's role 'to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences

from basic facts to ultimate facts.' " *Musacchio v. United States*, __U.S. __, 136 S.Ct. 709, 715, 193 L.Ed.2d 639 (2016), quoting *Jackson* at 319.

{¶31} By contrast, in determining whether a criminal conviction is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119. In order to satisfy this test, the state must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable doubt. *See State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304, syllabus (1988).

{¶32} When an appellate court concludes that the weight of the evidence supports a defendant's conviction, this conclusion necessarily includes a finding that sufficient evidence supports the conviction. *State v. Pollitt,* 4th Dist. Scioto No. 08CA3263, 2010-Ohio-2556, ¶ 15. " 'Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency.' " *State v. Lombardi,* 9th Dist. Summit No. 22435, 2005-Ohio-4942, ¶ 9, quoting *State v. Roberts,* 9th Dist. Lorain No. 96CA006462, 1997 WL 600669 (Sept. 17, 1997).

{¶33} Because Smith asserts that his conviction on count six (the February 5, 2019 controlled buy), the two firearm specifications, and having weapons under disability conviction are against the manifest weight of the evidence, and the firearms specifications & disability were unsupported by sufficient evidence, we will begin with the manifest

weight analysis. *See State v. Schroeder,* 2019-Ohio-4136, 147 N.E.3d 1, ¶ 59-65 (4th Dist.); *State v. Anderson,* 4th Dist. Highland No. 18CA14, 2019-Ohio-395, ¶ 13-15.

### 2. Analysis of Firearms

**{¶34}** The state alleged that Smith had two firearms on or about his person or under his control while trafficking in heroin in violation of R.C. 2925.03(A)(2)(C)(6)(g), a first-degree felony.[2] *See* R.C. 2941.141 and R.C. 2929.14(B)(1)(a)(iii) (providing a one-year mandatory prison term as a sentence enhancement). The state also alleged that Smith knowingly had a firearm while having been convicted of a felony offense of violence in violation of R.C. 2923.23(A)(2) (having a weapon under disability). The state introduced evidence of Smith's prior conviction of a felony offense of violence in West Virginia and Smith concedes that element of the offense.

**{¶35}** Smith argues that the state conceded at trial that Smith did not handle or touch the firearms. Therefore, the state had to prove "constructive possession," which required some evidence that he had the power to exercise dominion and control over the object. Smith argues that for a firearm specification to attach to a drug offense, the firearm must be in close proximity to the drugs. The state argues that there was ample evidence that the firearms and heroin were found in close proximity because the heroin was found up under the kitchen stove and the firearms were found in the kitchen closet.

**{¶36}** Possession may be actual or constructive. *State v. Butler,* 42 Ohio St.3d 174, 175, 538 N.E.2d 98 (1989) ("To constitute possession, it is sufficient that the defendant has constructive possession * * *."); *State v. Hankerson,* 70 Ohio St.2d 87, 434 N.E.2d 1362 (1982), syllabus. " 'Actual possession exists when the circumstances

---

[2] The trial court merged the two specifications at sentencing and enhanced Smith's prison term by one year.

indicate that an individual has or had an item within his immediate physical possession.' " *State v. Kingsland*, 177 Ohio App.3d 655, 2008–Ohio–4148, 895 N.E.2d 633, ¶ 13 (4th Dist.), quoting *State v. Fry*, 4th Dist. Jackson No. 03CA26, 2004–Ohio–5747, ¶ 39. "Constructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical possession." *Hankerson*, syllabus; *State v. Brown*, 4th Dist. Athens No. 09CA3, 2009–Ohio–5390, ¶ 19. For constructive possession to exist, the state must show that the defendant was conscious of the object's presence. *Hankerson*, 70 Ohio St.2d at 91, 434 N.E.2d 1362; *Kingsland* at ¶ 13; *accord State v. Huckleberry*, 4th Dist. Scioto No. 07CA3142, 2008–Ohio–1007, ¶ 34; *State v. Harrington*, 4th Dist. Scioto No. 05CA3038, 2006–Ohio–4388, ¶ 15. Both dominion and control, and whether a person was conscious of the object's presence, may be established through circumstantial evidence. *E.g., Brown* at ¶ 19; *see, e.g., State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus (stating that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value"). *E.g., State v. Bradshaw*, 4th Dist. Scioto No. 17CA3803, 2018-Ohio-1105, ¶ 73. "Moreover, two or more persons may have joint constructive possession of the same object." *State v. Brown*, 4th Dist. Athens No. 09CA3, 2009-Ohio-5390, ¶ 19.

{¶37} Investigator Adkins testified about his involvement in the five controlled drug buys that were made by a confidential informant and the audio/video recordings of four of the five controlled buys. Investigator Adkins also testified about surveillance video made outside of apartment 5C that showed Smith using a key to lock and unlock the door as he came and went from the apartment, which indicated that Smith had access and

control over the apartment. Investigator Adkins also testified that Smith also left apartment 5C during several of the controlled buys and went to apartment 10C to obtain methamphetamine to sell to the confidential informant. Investigator Adkins stated that, based on the information obtained through the controlled buys, he obtained and executed a search warrant on Holiday Apartments No. 5C, the location the five controlled buys occurred, and apartment 10C, an uninhabited apartment where Smith stored large quantities of drugs and money. Investigator Marcum testified that he took the set of keys on the lanyard that was seen on Smith during the controlled buy videos and determined that it included keys for both apartment 5C and 10C.

{¶38} While searching apartment 5C, Investigator Adkins discovered two shotguns in the closet located in a common area between the stairs, living room, and kitchen.  The state introduced the two shotguns and photographs of the closet and the shotguns.  Also hanging on the door of the closet with the shotguns was a black computer bag Smith used in several of the controlled buys. Investigator Adkins testified that the shotguns in the closet were loaded and were "within mere feet" of Smith during the drug sales to the confidential informant.  Investigator Marcum testified that he had test fired the shotguns and both operated properly.

{¶39}  Smith, in his interrogation, denied living at apartment 5C, but admitted that he was at apartment 5C every day and does his laundry there.  He also admitted that he owned an electric piano keyboard and other musical equipment in the apartment. Smith also eventually admitted that he owned everything in apartment 5C, which would include the two shotguns in the closet where he also stored his black computer bag:

Smith: Everything's mine! The fucking dope, the money is mine. Don't nobody know about nothing. Don't nobody had nothing to do about nothing. Okay. The shit is mine. Fuck! I don't care. Everything's mine. It's all mine.

**{¶40}** Under these circumstances, weighing the strength and credibility of the evidence presented and the inferences to be reasonably drawn therefrom, we find Smith's firearm specifications and weapon under a disability conviction is not against the manifest weight of the evidence. As outlined above, the state presented credible evidence that Smith had access to the weapons and had the ability to control their use; a rational trier of fact could have reasonably determined he had constructive possession of the firearms found in the closet. *See State v. Wilson*, 10th Dist. Franklin14AP-905, 2016-Ohio-3185, ¶ 72-76. Whether Smith did, or did not, own the firearms is of no consequence. *State v. Davis*, 8th Dist. Cuyahoga No. 104221, 2016-Ohio-7964, ¶ 20. And, "the fact that other individuals had access to the residence 'is not dispositive of the issue of whether [appellant] had constructive possession' of the drugs and weapon." *Walker*, 2016-Ohio-3185, ¶ 75, quoting *State v. Tyler*, 8th Dist. No. 99402, 2013–Ohio–5242, ¶ 24. Accordingly, we cannot say the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction is against the manifest weight of the evidence. *See State v. Kyle*, 8th Dist. Cuyahoga No. 108702, 2020-Ohio-3281, ¶ 41-44. Because these convictions are not against the manifest weight of the evidence, they are necessarily supported by sufficient evidence. *Lombardi, supra; Roberts, supra.*

3. Analysis of Count Six – February 5, 2019 Controlled Buy

**{¶41}** Smith contends that the jury lost its way in believing the testimony of the confidential informant and not dismissing count six, which was the drug trafficking charge based on the controlled buy on February 5, 2019 for which there was no recording.

{¶42} Count Six of the indictment alleged that on February 5, 2019, Smith sold 2 grams of heroin in violation of R.C. 2925.03(A)(1)(C)(6)(c). The state had to prove that on February 5, 2019, Smith knowingly sold one gram but less than five grams of heroin.

{¶43} The confidential informant ("CI") testified in detail about all five controlled drug buys. The CI testified that he had a history of purchasing drugs from Smith and was cooperating with the Lawrence County Drug and Major Crime Task Force in exchange for the dismissal of his own drug charges. After explaining how the controlled drug buys were set up, the CI testified that his first controlled drug buy occurred on February 5, 2019 and he purchased two grams of heroin from Smith. Investigator Adkins also testified that the first controlled drug buy occurred on February 5, 2019 and the CI purchased heroin from Smith. The state introduced text messages between the CI and Smith related to the logistics of the February 5 buy as well as an audio recording between the CI and a female affiliated with Smith. Investigator Adkins testified that the audio/video recording of the February 5 controlled buy malfunctioned and could not be presented to the jury. However, Investigator Adkins testified that after the purchase, the CI turned over 2.4 grams of heroin purchased from Smith to Investigator Adkins. The drugs field tested positive for heroin and Investigator Adkins submitted it to the Bureau of Criminal Investigation ("BCI").

{¶44} The CI and Investigator Adkins testified about the next four controlled buys, all of which included audio/video recordings of Smith selling heroin and methamphetamines to the CI in exchange for marked money. The heroin and methamphetamines the CI purchased during each buy were given to Investigator Adkins, who field tested them and submitted them to BCI. The state played the recordings of the controlled buys to the jury, and introduced the drugs as exhibits, as well as the BCI report

analyzing the drug submissions. Investigator Marcum discovered a number of the bills from the marked money used for the controlled buys in apartment 10C during the execution of the search warrant

**{¶45}** Smith argues that the jury lost its way in believing the testimony of a confidential informant, who was a drug addict and had credibility problems. However, this argument ignores the testimony of Investigator Adkins, whose testimony about the February 5th controlled buy bolsters the CI's testimony, and it ignores the physical evidence of the 2.4 grams of heroin the CI turned over to Investigator Adkins. Moreover, the CI's testimony about the other four controlled buys was credible and supported by the audio/video recordings and the physical evidence of the heroin and methamphetamine he turned over following the buys, as well as Investigator Adkins's testimony and the BCI lab report. Therefore the jury could have found the CI's testimony about the February 5, 2019 controlled buy credible even though it was not recorded.

**{¶46}** The jury had the opportunity to view the witnesses' testimony and judge their credibility. Even though the recording for the February 5, 2019 controlled buy malfunctioned and was unavailable for review, the jury could properly give credit to the CI's testimony and the law enforcement officers. *See, e.g., State v. Mack*, 4th Dist. Washington No. 17CA34, 2018-Ohio-5165, ¶ 15-16, citing *State v. Haugh*, 6th Dist. Lucas No. L-15-115, 2016-Ohio-8008, ¶ 48 (rejecting manifest-weight argument because the jury was free to assess the credibility of co-defendants and inmates who had a motive to fabricate their testimony); *State v. Bussle*, 11th Dist. Portage No. 2009-P-0061, 2010-Ohio-4943, ¶ 69. The factfinder is entitled to believe one witness's testimony over that of another. "Ohio courts have held that the testimony of one witness, if believed by the jury,

is enough to support a conviction." *State v. Strong,* 10th Dist. Franklin No. 09AP-874, 2011-Ohio-1024, ¶ 42.

**{¶47}** We give deference to the jury's judgment on witness credibility. After reviewing the entire record, we conclude the jury has not clearly lost its way and created such a manifest miscarriage of justice that we must reverse Smith's drug trafficking conviction.

**{¶48}** We find that Smith's firearm specifications, having a weapon under disability, and his drug trafficking convictions are supported by both sufficient evidence and the manifest weight of the evidence. We overrule Smith's second and fourth assignments of error.

### C.  Smith's Sentence

**{¶49}** Smith contends that the trial court erred in sentencing him to 54.5 years in prison. Specifically, Smith argues that "the record does not support a sentence of 54.5 years under R.C. 2929.11 and 2929.12." Smith objects to receiving the maximum term for each offense (except for the weapons under disability, for which the court sentenced him to a term of 2.5 years, rather than 3 years). He argues, "Indeed, why the Court selected the maximum term for every offense is not explained." He argues that the record "does not reflect the deliberate consideration and weighing that R.C. 2929.11 and 2929.12 require." Smith's assignment of error contests the maximum sentences imposed on each count.

**{¶50}** Smith does not challenge the trial court's decision to run those sentences consecutively. Smith failed to object to the imposition of consecutive sentences at the sentencing hearing and forfeited the issue, absent plain error, which he has failed to raise.

*State v. Hunter*, 131 Ohio St.3d 67, 89, 2011–Ohio–6524, 960 N.E.2d 955, ¶ 152 (2011).

Plain error exists when the error is plain or obvious and when the error affects substantial

rights. To rise to the level of plain error, it must appear on the face of the record that an

error occurred. *State v. Slagle,* 65 Ohio St.3d 597, 605, 605 N.E.2d 916 (1992) ("The

appellate court must examine the error asserted by the defendant-appellant in light of all

of the evidence"); *State v. Plymale*, 4th Dist. Gallia No. 15CA1, 2016-Ohio-3340, ¶ 52.

Because the trial court made the statutory findings set forth in R.C. 2929.14(C)(4) at the

sentencing hearing and in the sentencing order, we find no plain error in the imposition of

consecutive sentences.

### 1. Standard of Review

**{¶51}** R.C. 2929.11 and 2929.12 apply only to a review of individual sentences.

*Gwynne* at ¶ 16 -17. Thus, an appellate court may vacate or modify any sentence that is

not clearly and convincingly contrary to law if the appellate court concludes, by clear and

convincing evidence, that the record does not support the sentence. *State v. Marcum,*

146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 22-23.

> In Ohio, two statutory sections serve as a general guide for every sentencing. First, R.C. 2929.11(A) provides that the overriding purposes of felony sentencing "are to protect the public from future crime by the offender and others and to punish the offender." To achieve these purposes, the trial court "shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution." *Id.* The sentence must be "commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders." R.C. 2929.11(B). * * *
>
> Second, R.C. 2929.12 specifically provides that in exercising its discretion, a trial court must consider certain factors that make the offense more or less serious and that indicate whether the offender is more or less likely to commit future offenses. * * *

[A]n offender's conduct is considered less serious when there are "substantial grounds to mitigate the offender's conduct, although the grounds are not enough to constitute a defense." R.C. 2929.12(C)(4). R.C. 2929.12(C) and (E) also permit a trial court to consider "any other relevant factors" to determine that an offense is less serious or that an offender is less likely to recidivate.

*State v. Day,* 2019-Ohio-4816, 149 N.E.3d 122, ¶ 15 (4th Dist.), quoting *State v. Long*, 138 Ohio St.3d 478, 2014-Ohio-849, 8 N.E.3d 890, ¶ 17–18.

{¶52} A sentence is not contrary to law if a trial court considered the R.C. 2929.11 purposes and principles of sentencing, as well as the R.C. 2929.12 seriousness and recidivism factors, properly applied post-release control, and imposed a sentence within the statutory range. *State v. Prater*, *supra,* at ¶ 20; *State v. Graham, supra,* at ¶ 16; *State v. Perry*, 4th Dist. Pike No. 16CA863, 2017-Ohio-69, ¶ 21; *State v. Brewer,* 2014-Ohio-1903, 11 N.E.3d 317, ¶ 38 (4th Dist.). "These are not fact-finding statutes, and in the absence of an affirmative demonstration by the defendant to the contrary, we may presume that the trial court considered them." *State v. Chandler*, 1st Dist. Hamilton No. C-190153, 2020-Ohio-164, ¶ 8.

{¶53} " 'Once the trial court considers R.C. 2929.11 and 2929.12, the burden is on the defendant to demonstrate by clear and convincing evidence that the record does not support his sentence.' " *State v. Colburn*, 4th Dist. Pike No. 19CA896, 2019-Ohio-4240, ¶ 15, quoting *State v. Akins-Daniels*, 8th Dist. Cuyahoga No. 103817, 2016-Ohio-7048, ¶ 9; State v. O'Neill, 3d Dist. Allen No. 1-09-27, 2009-Ohio-6156, fn. 1.

2. Analysis

{¶54} At the sentencing hearing and in the sentencing order the trial court sentenced Smith as follows:  18 months each on the four fourth-degree felony counts six, eight, ten, twelve and fourteen; 8 years each on the five second-degree felony counts

seven, nine, eleven, thirteen, and sixteen; 11 years on the one first-degree felony count fifteen; 1 year each on the two gun specifications, which merged and that 1-year term to be served first; and 30 months on count seventeen. The trial court ordered the 1-year term on the gun specification to be served first, then ordered that count seven and eight run concurrent to each other but consecutive to all other counts; count nine and ten concurrent, but consecutive to all other counts; counts eleven and twelve run concurrent to each other but consecutive to all other counts; count thirteen and fourteen concurrent but consecutive to all other counts; and count seventeen consecutive to all other counts.

{¶55} The court did not address the consecutive or concurrent aspect of count six, but because the trial court specifically ordered all other remaining counts to run consecutive to count six, count six cannot run concurrent with any of the other counts. Additionally, the enhanced 1-year term for the gun specification must be served "consecutively to any other prison term * * * and consecutively to any other prison term or mandatory prison term previously or subsequently imposed upon the offender." R.C. 2929.14(C)(1)(a); *State ex rel. Shafer v. Wainwright*, 156 Ohio St.3d 559, 2019-Ohio-1828, 130 N.E.3d 268, ¶ 11. The total sentence, adjusting for concurrent sentences, is the addition of 1 year on the gun specification, 18 months on count six, 8 years on count seven, 8 years on count nine, 8 years on count eleven, 8 years on count thirteen, 11 years on count fifteen, 8 years on count sixteen, and 30 months on count seventeen, for a total of 56 years in prison for drug trafficking and weapon charges because the 1-year gun specification and count six (18 months) run consecutively to each other.

{¶56} Smith incorrectly calculates 54.5 years because he incorrectly determined that "[a]part from the weapon under disability charge (30 months rather than the three

years requested by the state), the court adopted the state's recommendation to sentence Smith to the maximum term and run those terms consecutively." The state's recommendation was to run count six concurrently: "as it relates to count six, uh, the State would recommend eighteen months in prison, and I would ask that you run that concurrent with all other charges * * *." But the trial court did not adopt this recommendation – it ran all other counts consecutive to count six. If the trial court would have run count six concurrently with all other counts, instead of having all other counts run consecutively to count six, Smith's calculation would be correct, we would subtract that 18 month term from 56 years, which would result in a 54.5 year prison term. But the court's entry runs all other terms consecutively to count six. As a result, Smith's total prison term is 56 years.

{¶57} Here, Smith was charged with firearm violations and multiple drug trafficking charges for heroin and methamphetamines which included fourth, third, second, and first degree felonies. He had two loaded firearms within a few feet from him during the controlled buys. The large quantity of heroin found during the search warrant classified Smith as a "major drug offender" under the statute, which required a mandatory maximum first-degree felony prison term of 11 years. He had over $33,000.00 in drug money in his possession the day law enforcement executed the search warrant. The trial court was aware of Smith's statements during his interrogation that he "was in love with" drug trafficking and that he was not responsible for drug-related deaths because he saw those as the drug users' problem. Smith admitted to not doing an honest day's work in his life.

{¶58} The state provided a sentencing statement that included Smith's serious criminal history, including a home invasion conviction and weapons charge in Michigan

and a voluntary manslaughter conviction in West Virginia. Smith was in possession of some of the largest amounts of heroin and methamphetamine that the Lawrence County Drug and Major Crime Task Force has ever recovered.

**{¶59}** The trial court stated that it "weighed the purposes and principals of sentencing in R.C. 2929.11, the seriousness and recidivism factors in R.C. 2929.12, and following the guidance of R.C. 2929.13" imposed the maximum sentences for each drug offense on Smith. The trial court also found, "consecutive sentences are necessary to punish the offender. Consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the defendant poses to the public. And the Defendant's history of criminal conduct demonstrates that the consecutive sentences are necessary to protect the public from future crimes of the Defendant."

**{¶60}** Smith does not argue that R.C. 2929.13(B) or (D), R.C. 2929.14(B)(2)(e), or 2929.20(I) apply to the sentences at issue. Rather, he summarily argues his sentence is not clearly and convincingly supported by the record and the record does not reflect "deliberate consideration and weighing that R.C. 2929.11 and 2929.12 require." However, the record reflects that the trial court expressly considered R.C. 2929.11 and 2929.12, properly applied postrelease control, and sentenced Smith within the statutory range. Thus, Smith's sentences are not clearly and convincingly contrary to law. Therefore, we are left to apply the standard in *Marcum* and determine whether there is clear and convincing evidence that the record does not support the sentence upon consideration of R.C. 2929.11 and 2929.12.

**{¶61}** The trial court stated that it considered R.C. 2929.11 and 2929.12, and the guidance of R.C. 2929.13. Thus the burden is on Smith to demonstrate by clear and

convincing evidence that the record does not support his sentence. Smith does not cite to anything in the record to support his argument that he should have been sentenced differently or that his sentence is inconsistent with sentences imposed for similar crimes committed by similar offenders. We note the quantity of controlled substances involved here, combined with Smith's felony record for other violent offenses, support the trial court's sentences. Smith has not shown by clear and convincing evidence that the record does not support the individual sentences.

**{¶62}** We overrule Smith's third assignment of error.

IV. CONCLUSION

**{¶63}** We overrule Smith's assignments of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## <u>JUDGMENT ENTRY</u>

It is ordered that the JUDGMENT IS AFFIRMED.  Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the LAWRENCE COUNTY COURT OF COMMON PLEAS, to carry this judgment into execution.

<u>IF</u> A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, J.:  Concur in Judgment and Opinion.


For the Court


BY: _____
        Michael D. Hess, Judge



### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**